IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL ACTION |
| | : | |
| | : | |
| v. | : | |
| | : | |
| MICHAEL WALKER, | : | NO. 2:09-cr-00478-LDD |
| Defendant. | : | |

<u>Memorandum</u>                                                                                    <u>July 28, 2011</u>

Before the Court are the United States Government's and Defendant Michael Walker's

respective objections to the Probation Department's Presentence Report (PSR) in this case.  The

government and Walker both object to the Probation Department's loss calculation, and resulting

12-level enhancement, under United States Sentencing Commission Guidelines Manual

("Guidelines") Section 2B1.1(b)(1).  The government seeks a 14-level enhancement based on its

conclusion that the fraud scheme in question spanned a greater time period than the Probation

Department determined, and thus involved greater loss to the victim—the United States Mint.

Walker argues that there was no financial loss to the Mint in this case and the methods the

government has used to attempt to prove loss are unreliable; therefore, there should be no

enhancement for loss under Section 2B1.1(b)(1).  The government also objects to the Probation

Department's determination that a 2-level enhancement for use of sophisticated means under

Section 2B1.1(b)(9)(C) does not apply.  Walker objects to the Probation Department's

application of separate 2-level enhancements for abuse of a position of trust under Section 3B1.3

and obstruction of justice under Section 3C1.1.  Walker also objects to the Probation

Department's determination that a 2-level downward adjustment for acceptance of responsibility

under Section 3E1.1(a) should not apply.  On May 24 and 25, 2011, the Court held a hearing on

the parties' objections.  Upon consideration of the evidence and arguments presented at the

hearing and in the parties' respective sentencing memoranda (Doc. No. 87—Government; Doc.

No. 88—Walker), we find that:

1.    A 2-level enhancement under Section 2B1.1(b)(1), reflecting gain to Walker in the amount of $6,113, applies.  The theory and methods the government relies upon to extrapolate loss, as generally adopted by the Probation Department, are not sufficiently reliable to support a sentencing decision.  Because the actual loss to the victim can not be established, the gain amount of $6,113 to Walker serves as a reasonable surrogate for loss in this case.  Therefore, the government's objection is overruled and Walker's objection is overruled in part and sustained[1] in part.

2.    A 2-level enhancement for use of sophisticated means under Section 2B1.1(b)(9) does not apply, and the government's objection is overruled.

3.    A 2-level enhancement for abuse of a position of trust under Section 3B1.3 applies, and Walker's objection is overruled.

4.    A 2-level enhancement for obstruction of justice under Section 3C1.1 applies, and Walker's objection is overruled.

5.    A 2-level reduction for acceptance of responsibility under Section 3E1.1(a) applies, and Walker's objection is sustained.

6.    The Total Offense Level for Walker's offenses is 13.

I.    BACKGROUND AND FINDINGS OF FACT[2]

---

[1]Although in his memorandum Walker argued that there was no loss in this case, at the hearing, the defense raised, as alternative theory, that the gain in this case may reflect the employment compensation, gifts, and travel reimbursement Walker received.  (Sentencing Hr'g Tr.  Doc. No. 96 at 285 (May 25, 2011).)

[2]The facts comprising this section come primarily from the statement of evidence presented by the government at the February 24, 2011 Change of Plea hearing where Walker

The underlying facts in this case are largely undisputed.  Michael Walker was first employed by the U.S. Mint in 1983.  In 1996, he began working in the Mint's Supply Department as an Inventory Management Specialist, where he was responsible for monitoring supply inventories and requesting replacement products for the Mint when necessary.  At the time in question, the Mint's acquisition practices were generally framed by an assortment of written guidelines, unpromulgated rules, and unwritten tradition.  The United States Mint Procurement Guidelines ("Procurement Guidelines"), as provided in Defendant's Exhibit 12 (dated Nov. 2003), outline, in very general terms, the Mint's procurement operational policies. The Procurement Guidelines provide, in relevant part:

> Maximal System Efficiency.  The goal of all procurement offices shall be to acquire products and services that will provide the best value to the Mint in a timely manner that most effectively meets program needs.  The waiver of provisions of law governing procurement or public contracts allows the Mint to satisfy this objective free of the normal constraints of federal procurement.  The acquisition process shall, accordingly, encourage flexibility, innovation, responsiveness, and the use of sound business judgment, consistent with the general principles set forth herein.  In order to ensure that maximum efficiency is achieved, internal rules, policies, and procedures shall only be promulgated when their benefits clearly exceed the costs of their development, implementation, administration and enforcement.[3]

Consistent with this general directive, the specifics as to how the acquisition process actually worked at the Mint are not set forth in any written rules that have been provided to the Court.  Instead, the various policies and procedures have been described through the testimony

---

entered a guilty plea and admitted to the government's factual statements with few objections. These facts are supplemented by certain relevant evidence presented at the sentencing hearing on May 24 and 25, 2011, which we have found to be truthful.

[3]Def's. Ex. 12.

3

of witnesses in various hearings and to the Grand Jury, and through the admissions of Walker at his change of plea hearing.

The record demonstrates that, as an inventory management specialist, Walker could order supplies for the Mint in two ways: (1) by submitting requisitions to the Mint's Procurement Department, which would review the requisitions and place orders, and (2) through the use of a government-issued credit card.

The process under the first method would differ depending on whether the total cost of supplies on the requisition was greater or less than the mandatory competitive level of $5,000—i.e., the "micro-purchase threshold." If a requisition was for an amount less than the $5,000 threshold, Walker could recommend the vendor based on recent orders and submit the request to the Procurement Department. Before the requisition was sent to procurement, however, it would have to be approved by the supervisor in the supply division.[4] If the supervisor was out on leave, Walker and the other inventory specialists could approve and send the requisitions to procurement themselves.[5] Once a requisition was at the Procurement Department, the head of procurement would assign it to an agent within the department who would generally call various vendors for prices and lead times before ultimately turning the requisition into a purchase order.[6] It was the general practice, however, that the purchasing agent would use the vendor recommended by the inventory specialist on the requisition form.

Requisitions over $5,000, on the other hand, required a formal bidding process, with two

---

[4]Doc. No. 96, Sentencing Hr'g Tr. 27:6-10 (May 25, 2011).

[5]Doc. No. 96, Sentencing Hr'g Tr. 41-42 (May 25, 2011).

[6]See Doc. No. 95, Sentencing Hr'g Tr. 44:22-24 (May 24, 2011); Doc. No. 96, Sentencing Hr'g Tr. 58-59 (May 25, 2011).

exceptions: (1) if there was only one vendor that sold the particular type of supplies, or (2) if  the supplies were covered by a Blanket Purchase Agreement (BPA)—a type of contact that the Mint would enter into with vendors based on a panel review of bids.  Under a BPA, the Mint would agree to make all purchases of particular supplies at a pre-set price.

Beginning in 2002, Walker was authorized to order supplies through the second method—the use of a government-issued credit card.  With this credit card, Walker could contact a supply vendor directly, order supplies, and instruct the vendor to charge the account as long as the transaction did not exceed $5,000 and his monthly charges did not exceed $32,000.  The Mint provided purchasing card users, including Walker, with written handbooks containing instructions as to how the credit cards were to be used.  These handbooks afforded substantial discretion to the users of the cards.  Indeed, in each of the Purchasing Card Handbooks provided in the government's exhibits, covering years 2002, 2004, and 2005,[7] the first section, entitled "Why Should I Use the Purchase Card?" provided the bulleted point, "I can make my own purchasing decisions."[8]  The 2002 and 2004 handbooks did, however, provide further guidance on certain purchases where they list the "preferred vendors" for certain types of supplies.  The preferred vendor for IT supplies and services was a company called CDW-G, and for office supplies, Boise Cascade.[9]  The 2005 version of the handbook eliminated this section on

_____

[7]The 2003 Purchasing Card Handbook was not provided to the Court.

[8]2002 Purchase Card Handbook, Gov't's Ex. 150 at 4; 2004 Purchasing Card Handbook, Gov't's Ex. 151 at 4; 2005 Purchasing Card Handbook, Gov't's Ex. 152 at4.

[9]2002 Purchase Card Handbook, Gov't's Ex. 150 at 6; 2004 Purchasing Card Handbook, Gov't's Ex. 151 at 6.

preferred vendors.[10]    Instead, it added a section entitled "Utilizing Small Businesses," which

stated that "the Mint encourages the use of small, minority, and women-owned businesses . . .

."[11]  The Section goes on, "[y]ou *may* use a government resource such as GSA Advantage . . . ."[12]

The handbooks also state that it was the job of the "Approving Official,"[13] which in this instance

was the supervisor in the supply division,[14] to review and reconcile the statements of credit card

purchases made by the inventory specialists on a monthly basis.[15]

 At roughly the same time that Walker received authorization to use a credit card to make

purchases, but no later than September of 2002, Walker attended ethics training seminars at

which he was specifically instructed about federal statutes and Mint regulations that prohibited

him from (1) accepting gifts greater than $20 per gift or $50 per year, and (2) working for any

company that did, or sought to do, business with the Mint.  As part of this ethics training, Walker

received instruction that 18 U.S.C. § 208, the "conflict of interest" statute underlying Counts 11

through 15 of the indictment, prohibited him from participating personally and substantially in

an official capacity in any matter affecting the financial interest of an organization that employed

him, or with which he was negotiating or had an arrangement concerning prospective

employment.  As part of this ethics training, Walker was also instructed that because of his job

---

[10]2005 Purchasing Card Handbook, Gov't Ex. 152.

[11]2005 Purchasing Card Handbook, Gov't Ex. 152 at 11.

[12]2005 Purchasing Card Handbook, Gov't Ex. 152 at 11 (emphasis added).

[13]2005 Purchasing Card Handbook, Gov't Ex. 152 at 9.

[14]Sentencing Hr'g Tr. Doc. No. 96 at 14, 16, 259 (May 25, 2011).

[15]2005 Purchasing Card Handbook, Gov't Ex. 152 at 9.

responsibilities, he was required to report nearly all sources of non-federal income, gifts and travel reimbursements on Office of Government Ethics (OGE) Form 450.

Despite this training and instruction, from 2004 through 2006, Walker ordered $629,683.73 in supplies from KLH Enterprises, a minority-owned company formed by his friend and former Mint employee, Kevin Hailey.  At the same time Walker was ordering these supplies from KLH, he received between $6,000 and $7,000 in total employment income and gifts from KLH and Hailey.[16]

Of the $629,683.73 in supplies Walker caused to be ordered from KLH, he charged $438,671.71 to his government-issued credit card.  Among these orders were countless IT and office supplies for which the Mint had preferred vendor contracts.[17]  The remaining $191,012.03 over this period was requested by Walker via requisition.  Notably, Walker submitted 23 requisitions in the amount of $4,999, thirteen of which were approved.  At least one of these requisitions originally requested $5,000, however the amount was converted to $4,999 by the Procurement Department.[18]  When asked, Walker informed the head of the Procurement

---

[16]See Gov't's Exs. 206 & 209.

[17]Although the evidence demonstrates that the Mint had entered into contracts with vendors for preferred rates on IT and office supplies, (Doc. No. 95, Sentencing Hr'g Tr.  100-101, 107 (May 24, 2011)), there was no policy stating that these types of supplies must be purchased from the preferred vendors.  Many Mint employees purchased these types of supplies from non-preferred sources, including KLH.  Furthermore, as discussed above, while the Mint purchasing card handbook had language regarding preferred vendors in its 2002 and 2004 iterations, this language was eliminated in the 2005 publication. The 2005 version of the credit card handbook instead contains a provision regarding the use of small and "green" businesses.

[18]Testimony of Procurement Agent Steven Lewis, Doc. No. 96, Sentencing Hr'g Tr. 62:20-25; 63:1 (May 25, 2011) ("Okay, when they came up at 5,000 and I told them that I was changing it to 4,999, then once again, I take it in and had everything in the file and everything for the contract, and officer's signature and approval.  But I told them, I said there's no sense in signing up for 5,000.  I mean, it's just a penny. Send it out for 4,999 and I don't have to do all

Department, Joseph Strenchock, that he was using the requisitions to purchase paper from KLH. In reality, each $4,999 requisition essentially constituted a line of credit at KLH against which Walker would order items such as inkjet cartridges, lobby brooms, dust pans, and flat lids.  The $4,999 requisitions submitted by Walker also referenced a "BPA for office supplies."  While a BPA number for KLH was created, no panel had ever convened to review bids and grant the award.  The evidence is inconclusive as to who authorized the creation of a BPA number for KLH.  It is clear, though,  that Walker did not have this level of authority.  Finally, nine of the $4,999 requisitions sent on to the Procurement Department were transmitted directly from Walker's own computer, and were not first approved by the supply chief.

From 2004 through early 2006, while Walker was causing the Mint to order the above-described $629,683.73 in supplies from KLH, he received employment income, gifts and, travel reimbursement from KLH and Hailey, ultimately totaling more than $6,000.  On three annual OGE Form 450s that Walker filled out during the relevant time period, he did not report the income, gifts, or travel reimbursements he received from KLH or Hailey.[19]  Additionally, on March 21, 2006, Walker told a U.S. Postal Inspector that he never worked for KLH or Hailey, even through he had received multiple paychecks from KLH in 2005 alone.[20]

At the change of plea hearing held on February 24, 2011, Walker admitted to the material facts that he agrees constituted a scheme to defraud the United States Mint.  Walker conceded

---

the crossing off.")

[19]These omissions provide the basis for the charges in Counts 16, 17, and 19 of the indictment—making false statements in contravention of 18 U.S.C. § 1001.

[20]This statement provides the basis for the charge in Count 18 of the indictment—making false statements in contravention of 18 U.S.C. § 1001.

that he intentionally kept the fact that he was receiving income and gifts from KLH a secret, so that he may maintain employment and give business to his friend.[21]  Walker acknowledged that this concealment prevented the Mint from making an informed decision as to who should be the vendor for the items eventually ordered by the Mint.[22]  He admitted that, had the relevant employees of the Mint been aware of the facts Walker concealed, they would have scrutinized his purchases more carefully.[23]  As a result, Walker admits that the Mint was deprived of the ability to "adequately dole out [its] funds."[24]  At the sentencing hearing, the only dissenting statements Walker raised were that (1) he did not work for KLH prior to 2005[25]; (2) he did not create the false BPA number for KLH[26]; (3) approving requisitions was not outside the scope of his job responsibilities[27]; and (4) he was not the only one who referenced the false BPA number for KLH.[28]

     Having admitted to the facts comprising the offenses of conviction, Walker entered a plea of guilty to five counts of mail fraud in violation of 18 U.S.C. §§ 1341, five counts of wire fraud in violation of 18 U.S.C. §§ 1343, five counts of conflict-of-interest in violation of 18 U.S.C. §

---

[21]Change of Plea Hr'g at 85 (Feb. 24. 2011).

[22]Change of Plea Hr'g at 85-86.

[23]Change of Plea Hr'g at 86.

[24]Change of Plea Hr'g at 86.

[25]Change of Plea Hr'g at 61.

[26]Change of Plea Hr'g at 63.

[27]Change of Plea Hr'g at 64.

[28]Change of Plea Hr'g at 69.

208(a), and four counts of making false statements to agents of the government in violation of 18 U.S.C. § 1001.  On April 18, 2011,[29] the Probation Department prepared a PSR recommending a guideline offense level of 23 for the Group One offenses, which include the mail fraud, wire fraud, and false statement charges, and an offense level of 12 for the Group Two offenses, which include the conflict-of-interest charges.  The Group One offense level was driven primarily by a 12-point enhancement for an estimated overcharge to the Mint of $350,985.71, reflecting the difference between what the Mint paid as a result of Walker's scheme, and what it would have paid had the Mint purchased the supplies through General Services Administration (GSA) channels.  The Probation Department also factored in two separate 2-point enhancements for abuse of position of trust and obstruction of justice.  The Probation Department did not apply an enhancement under U.S.S.G. § 2B1.1(b)(9) for the use of sophisticated means, nor did it provide a 2-level downward adjustment for acceptance of responsibility under Section 3E1.1(a).

II.       DISCUSSION AND CONCLUSIONS OF LAW

The government and Walker have filed various objections to the PSR.  Both parties object to the Probation Department's loss calculation, and resulting 12-level enhancement, under U.S.S.G § 2B1.1(b)(1).  The government seeks a 14-level enhancement based on its conclusion that the scheme in question began four years earlier than the Probation Department determined, and therefore involved an estimated loss of $497,772.22 to the Mint.  Walker, on the other hand, argues that there was no financial loss to the Mint in the case and the methods the government has used to attempt to prove loss are unreliable such that there should be no enhancement for

---

[29]Revised on May 9, 2011.

loss under Section 2B1.1(b)(1).  The government also objects to the Department's determination that a 2-level enhancement for use of sophisticated means under U.S.S.G. § 2B1.1(b)(9) does not apply.  Walker objects to the Department's determinations that separate 2-level enhancements for abuse of position of trust under Section 3B1.3 and obstruction of justice under Section 3C1.1 should apply.  Walker also argues that a 2-level downward adjustment for acceptance of responsibility under Section 3E1.1(a) should apply.

On May 24 and 25, 2011, the Court held an evidentiary hearing on the parties' objections. In assessing these objections, we apply a preponderance of the evidence standard to all relevant facts, United States v. West, 643 F.3d 102, 104-105 (3d Cir. 2011), and draw conclusions of law by examining the "plain and unambiguous language" of the Sentencing Guidelines and non-contradicting commentary to those Guidelines,  See United States v. Milan, 304 F.3d 273, 294 (3d Cir. 2002); United States v. Remoi, 404 F.3d 789, 795 (3d Cir. 2005).  We outline our findings and conclusions on each set of objections, in turn.

A.    Loss Calculation

The centerpiece of the government's loss calculation is a comparison between the prices of 22 separate items Walker ordered from KLH in 2005 and the prices Walker could have paid if he had purchased those same 22 items through GSA suppliers that same year.  The average savings on those 22 items, the government contends, was 55.74%.  By extrapolating this sample loss over the total number of orders Walker submitted, the government arrives at what it finds to be a reasonable estimate of the total loss amount—$497,722.22.[30]  The government attempts to

_____

[30]The Probation Department adopted this overcharge theory and used the 55.74% rate to calculate its total loss amount as well.  The government and Probation Department differ, however, as to the time period within which the scheme operated—the Probation Department

show that this loss amount is reasonable by comparing it to the gain provided to KLH over this same period by way of its profits on sales to the Mint. Here, the government argues that gain to KLH is an appropriate consideration because other vendors, which lost business as a result of the scheme, are considered victims in this case, and KLH's gain was a result of the loss they suffered. Finally, the government argues that, should we find that actual loss to the Mint can not be reasonably determined, the profits to KLH can serve as a surrogate for the Mint's loss, because, despite the fact that KLH was not indicted in this case, the Court could find by a preponderance of the evidence that KLH was, in fact, a co-conspirator. We find however, that the government's ultimate loss estimate, and the ways it uses gain to KLH, are based on fundamentally flawed statistical methods and improper interpretations of the case law on point. Contrary to the government's arguments, the only statistically and legally reliable estimation of loss to support an enhancement in this case is provided by the gain Walker himself received in compensation from KLH and Hailey as a result of his scheme—an amount that the government, Walker, and the Probation Department agree is between $6,000 and $7,000.

        1.      The 55.74% Savings Figure

The source figures for the government's 55.74% savings calculation are provided in Government Exhibit 205B.[31] The chart set forth in that Exhibit distills 22 line items out of thousands ordered by Walker from KLH, which represent those the government asserts had

---

used 2004 to 2006, reflecting the period of time in which there is evidence to support compensation from KLH and Hailey to Walker, whereas the government asserts the scheme began no later than 2000.

    [31]GSA Comparison Chart, Gov't's Ex. 205B; Doc. No. 88-4, Gov't's Sentencing Mem. at 6.

matching descriptions and available price data from GSA in 2005.  Listed items include various quantities of "HP#57 Inkjet Cartridges," "Lobby Brooms,"  "Duracel AA Batteries," "Clear Heavy Duty Bags," "Tech Dusters," and "Recycled Copy Paper (8.5 x 11)," among others.  One column on the chart shows the price the Mint paid KLH for each item in 2005 as a result of Walker's orders, with a total charge for the 22-item sample of $16,293.06.  Another column shows the 2005 GSA price for items with the same description, and a total GSA price of $7,210.54.  Thus, the government argues, the Mint would have saved 55.74% had it purchased the items through GSA as opposed to KLH.  The government then applies this loss percentage to all the orders Walker submitted to reach its ultimate loss amount.  We find that, although the government's general extrapolation approach is supported by the case law,  its overall loss theory and the particular methods it employs to arrive at its savings percentage do not stand up to even the thinnest level of statistical or legal scrutiny.

Section 2B1.1, the Guidelines provision applicable to Walker's fraud offenses, provides graduated enhancements to the base offense level depending on the amount of pecuniary loss resulting from the offense.  U.S.S.G. § 2B1.1.  The commentary to this Section states that "[t]he court need make only a *reasonable estimate* of the loss."  Id. cmt. n.3(C) (emphasis added).  It is generally accepted that, in determining the loss amount under the Guidelines, the "district court may make a reasonable estimate by extrapolating the average amount of loss from known data and applying that average to transactions where the exact amount of loss is unknown."  United States v. Uddin,  551 F.3d 176, 180 (2d Cir. 2009) (internal citation and quotation marks omitted).  In a case involving the estimation of a quantity of drugs affecting the Guidelines range, the Third Circuit considered the use of extrapolation techniques and stated that "the

government must show, and the court must find, that there is an adequate basis in fact for the extrapolation and that the quantity was determined in a manner consistent with accepted standards of reliability." United States v. McCutchen, 992 F.2d 22, 25-26 (3d Cir. 1993). The same evidentiary principle is true in the present circumstances—"reasonable reliability is the touchstone of the determination." Id. at 26.

In the present case, we do not believe that there was sufficient evidence or testimony adduced by the government to establish that its loss estimate met accepted standards of reliability. Our determination here rests on two conclusions: first, the government has failed to demonstrate that GSA prices represent a proper basis for comparison in this case; and second, even if GSA did constitute a proper comparator, the government has not convinced us that items on either side of that comparison are similar in quantity or character such that a statistically and legally reliable overcharge percentage may be determined.

First, the government has not met its burden in demonstrating that a comparison between GSA prices and KLH prices reflects a proper construct of the Mint's loss from Walker's orders through KLH. Although it was certainly improper for Walker to order from KLH given his financial involvement with the company, it is clear that, during the time in question, the general use of local non-GSA small-business "middlemen" companies such as KLH for office supplies was not prohibited under any Mint policy or procedure. The Mint had a general practice of ordering from local small-business middlemen, including KLH and Carver Supply.[32] At least twenty-five other people at the Mint ordered supplies at various times from the KLH.[33] People

---

[32]Doc. No. 95, Sentencing Hr'g Tr. 58:2-19 (May 24, 2011).

[33]Def. Sentencing Hr'g Ex. D-9 (May 25, 2011).

at the Mint other than Walker used KLH for office supplies and found their terms, prices, and reliability to be favorable.[34]

The government's entire loss theory is predicated on the fact that the Mint would have saved more than $400,000 had Walker ordered from "alternate sources."[35]  The alternate sources the government picks for comparison are GSA sources.  However, the government has failed to demonstrate that GSA sources are generally comparable on the range appropriately considered factors to local small-business middlemen suppliers such as KLH or Carver Supply.  It would surprise no one that the prices between a local small-scale supplier and GSA, with its pre-negotiated rates, are different.  It is clear, however, that characteristics other than price were properly considered in the purchasing decision—notably lead time, reliability, and small-business or minority status.  Indeed, evidence suggests that, at one time in the early 2000s, the supply managers were moving away from GSA sources due to long delivery times and incomplete orders.[36]  Regardless of the ordering trends at the Mint, the evidence is very clear that it was not improper for Mint employees to order from non-GSA companies similarly-situated to KLH, and that terms other than price properly affected their decision.  Therefore, although the government's general "alternate source" theory may be correct, a proper application of that theory would consider the difference between KLH's prices and truly comparable alternate sources—i.e., other similarly-situated suppliers.  The government provided no evidence regarding comparable companies' prices. Accordingly, the government has failed to demonstrate

---

[34]Doc. No. 96, Sentencing Hr'g Tr.  106:21-25; 107:1-8 (May 25, 2011).

[35]Doc. No. 96, Sentencing Hr'g Tr.  255:14-18 (May 25, 2011).

[36]Doc. No. 96, Sentencing Hr'g Tr.  8-9 (May 25, 2011).

that the comparison between GSA prices and KLH's reflects a proper or reliable construct of loss to the Mint in this case.

Second, even if we were to assume that the comparison between KLH and GSA is valid, and that every purchase Walker made from KLH should have been made through GSA vendors, the government has failed to demonstrate that items on either side of its comparison are similar in quantity or character such that a statistically and legally reliable base overcharge factor may be determined.

At the May 24, 2011 sentencing hearing, James Howell, Special Agent with the Office of the Inspector General at the Department of Treasury, described the methodology the government used in compiling and analyzing the data to establish the 55.74% savings figure. Agent Howell took a large list of line items from invoices he obtained from either KLH or the Mint,[37] and sent them to his "counterparts" in the Inspector General's Office at GSA to obtain GSA's price information.[38] Howell testified that, of the thousands of orders placed with KLH by Walker, he and his counterparts were able to find price data on 22 items from fiscal year 2005 at GSA which matched the descriptions on the KLH invoices.[39] These 22 items are depicted on the chart in Government Exhibit 205B.[40] The chart shows line items with descriptions such as "Lobby Brooms," "Duracel 'AA' Batteries," "Clear Heavy Duty Bags," "Tech Dusters," "Recycled

---

[37]Doc. No. 95, Sentencing Hr'g Tr. 205-206 (May 24, 2011).

[38]Doc. No. 95, Sentencing Hr'g Tr. 177:19-21; 180:3-13; 206:15-20 (May 24, 2011).

[39]Doc. No. 95, Sentencing Hr'g Tr. 181:16-17 (May 24, 2011).

[40]GSA Comparison Chart, Gov't's Ex. 205B; Doc. No. 88-4, Gov't's Sentencing Mem. at 6.

16

Copy Paper (8.5 x 11)," and the like.[41]   The chart shows that on 10/18/2004, the Mint purchased

24 units of "Lobby Brooms" from KLH at a unit price of $8.49 for a total of $203.76.

Meanwhile, the next column of the chart demonstrates that the Mint could have purchased each

Lobby Broom unit from GSA for $2.08.   On 11/15/2004, the Mint purchased 500 "Duracel 'AA'

Batteries" from KLH at a unit price of $1.89 for a total of $945.00.   The GSA price for a unit of

"Duracel 'AA' Batteries" was, remarkably, $.02.   For 500 of these batteries, the Mint could have

paid a total of $10.00.   Each of these 22 items has a two to four word description, the number of

each item ordered, the KLH price, the GSA price, and the total cost to the Mint.

     For the overall quantity of the 22 line-item sample purchased, the Mint paid a total of

$16,293.06 to KLH.   According to the chart, if the Mint were to have purchased the same items

through GSA at these quantities, it would have paid $7,210.43, for a savings of 55.74%.   The

government then takes this base savings factor from the 22 items for which it had GSA

comparison data and extrapolates it over the tens-of-thousands of items the Mint purchased from

KLH as a result of Walker's orders to arrive at its ultimate loss estimate. We find the

government's estimate based on its 55.74% savings figure to be entirely unreliable, as the

descriptions of the goods are simply not specific enough, both in package/unit size and product

type, to draw a reasonable comparison.

     During cross-examination, Agent Howell was asked whether he was aware that lobby

brooms come in sizes of both twenty-four inches and twenty-eight inches long.[42]   He responded

---

[41]GSA Comparison Chart, Gov't's Sentencing Hr'g Ex. 205B; Gov't's Sentencing Mem.
Doc. No. 88-4 at 6.

[42]Doc. No. 95, Sentencing Hr'g Tr.  206:23-24 (May 24, 2011).

in the affirmative and there was a discussion as to whether the measurement reflected the

broom's length, height, or width, which is still unclear.[43]  Next, in response to an inquiry about

the "Duracel 'AA' Batteries" listed in the chart, Mr. Howell responded, "[w]e don't know if

that's a pack of ten, we don't know if that's a pack of a hundred.  So we did the best we could to

gather the information with the limited information we had."[44] When asked about the "Clear

Heavy Duty Bags," Mr. Howell acknowledged they come in different thicknesses, quantities,

rolled versus boxed packaging, and brand.[45]  He also acknowledged that "Tech Dusters" come in

various sizes, forms, and brands.[46]  Regarding the "Recycled Copy Paper" listed on the

comparison chart, Agent Howell acknowledged that the paper is made by different companies,

with different brightness, thickness, and uses, and he did not know if the KLH-GSA comparison

reflected similar types.[47]

_____

[43]Doc. No. 95, Sentencing Hr'g Tr.  206:23-24 (May 24, 2011):
        THE COURT:      Ma'am it wouldn't be long, it would be wide.
        MS. SPIZER:      Actually, I asked the same question and I think it's height.
        MR. DUBNOFF:    It's length.
        MS. SPIZER:      Oh, it is length.
        THE COURT:      It's length?
        UNIDENTIFIED SPEAKER:    It's usually by length for reach.
        MS. SPIZER       For reach, I guess is why --
        THE COURT:      It's the handle or the sweeping part that's twenty-four
                  inches?
        UNIDENTIFIED SPEAKER:    It's usually the handle.
        MS. SPIZER:      It's the handle.

[44]Doc. No. 95, Sentencing Hr'g Tr.  208:6-9 (May 24, 2011).

[45]Doc. No. 95, Sentencing Hr'g Tr.  208:13-24; 209:1-16 (May 24, 2011).

[46]Doc. No. 95, Sentencing Hr'g Tr.  210:6-16 (May 24, 2011).

[47]Doc. No. 95, Sentencing Hr'g Tr.  213:19-25; 214:1-10 (May 24, 2011).

Ultimately, Mr. Howell explained:

I'll be completely frank with you, some of these items on this list I have no idea what they are and what they're used for.  When I got the line items I just did the research based off the name.  I couldn't tell you what the functions are.  But if someone were to tell me it was used for a computer or for a printing press, I would not know the difference.[48]

. . .

The only information I had to go off of was the information that was in the . . . invoices . . . So if it had ["]lobby brooms twenty-two inches,["] then I was able to research it based on twenty-two inches.  If it had ["]lobby broom,["] then we had to use that information to the best of our abilities, whether it's a twenty-two inch broom, whether it's a thirty-six inch broom.  To us, we just try to be reasonable and see what else is ordered around that time frame to see if anything matches up.[49]

Although the Court appreciates that the government used the available information to the best of its abilities, prosecutorial and investigational effort are not factors we may properly consider when evaluating evidence affecting a fourteen-level enhancement under the sentencing guidelines.  Based on the evidence presented, we cannot say with any amount of confidence or conviction that the GSA and KLH items are reasonably comparable.  It is highly likely that each of the twenty-two items on either side of the comparison diverged significantly in terms of type and bulk, thus greatly affecting the price differential between them.  Without an acceptable comparison, the government's extrapolation is not reasonably reliable; therefore, it cannot provide the basis for the loss estimate under the Guidelines.

The government recognizes the deficiencies in its evidence and presentation but argues that there is an "irony" here—that is, "the reason why it is so difficult to obtain more detailed

---

[48]Doc. No. 95, Sentencing Hr'g Tr.  209:23-25; 210:1-4 (May 24, 2011).

[49]Doc. No. 95, Sentencing Hr'g Tr.  211:21-24; 212:1-8 (May 24, 2011)

information is precisely because of the fraud that Mr. Walker committed."[50]  The government argues that the manner in which Walker ordered products, and the extent of his cover-up, are what cause the problems with the data—"if we were able to go back there at the time when the data was fresh to us, we would have been able to access this information."[51]  We find, however, that the lack of clear information is as much, if not more, a function of the Mint's failure to record and retain historical data as it is a function of Walker's fraud.  Furthermore, the government's "staleness" argument lacks merit.  The government alleges the scheme in question lasted until March of 2006.  The investigation into Walker's fraud began at that very time and culminated in an indictment filed in 2009.  We cannot credit a staleness argument involving the type of data in question faced with this brief a time frame.  Regardless, the irony of which the government complains cannot reduce us to relying on insupportable methods to find a loss amount.  We still need a reasonable estimate— the government's calculation does not provide it.

2.    Gain as Support and Surrogate for Loss

The government attempts to use the gain to KLH—in the form of its profits on Mint business over the time period in question, approximated at $325,000—to both support the loss estimate it comes up with through the faulty comparison described above, and to provide an independent surrogate for loss to the Mint.  Under its first theory, the government argues that gain to KLH is an appropriate consideration because other vendors, which lost business as a result of the scheme, are victims in this case, and KLH's profit reflects the loss they suffered.[52]

---

[50]Doc. No. 96, Sentencing Hr'g Tr.  240:15-21 (May 25, 2011)

[51]Doc. No. 96, Sentencing Hr'g Tr.  240:7-9 (May 25, 2011)

[52]Doc. No. 96, Sentencing Hr'g Tr.  272:19-25; 276:20-22 (May 26, 2011).

20

The government's second theory—that gain can provide a surrogate measure of loss—relies on its argument that, even though it was not indicted, KLH was a co-conspirator in this case, and a co-conspirator's gain can be used a surrogate measure of the victim's loss when such loss is indeterminable. We find neither manner in which the government uses KLH's profits to be appropriate or convincing. Instead, the gain to Walker over the time in question provides the proper substitute for loss in this case.

*a.      KLH's gain as support for the loss amount*

At the outset, for the same reasons discussed above regarding the government's faulty loss construct, a consideration of KLH's profits in a vacuum, devoid of any comparison to similarly-situated businesses, says nothing about the actual amount of loss to the Mint. More importantly, however, the Third Circuit has considered, and explicitly rejected the theory the government relies on here—that "other vendors," who have been deprived of an opportunity to receive business, constitute cognizable victims in a fraud scheme such as this one.

The Third Circuit case United States v. Henry, 29 F.3d 112 (3d Cir. 1994), considered the viability of a fraud theory predicated on the deprivation of an opportunity to receive business. That case involved the prosecution of toll bridge commission officials for bank and wire fraud in connection with an alleged bid-rigging scheme. The defendant-officials were in control of millions of dollars of toll revenue that they were required to invest in short-term certificates of deposit at banks selected for their interest rates through a competitive bidding process. Id. at 112. The officials interfered with the bidding process by disclosing bids to a certain bank, which was able to narrowly outbid the other banks by offering a slightly better rate. In return, the chosen bank provided compensation to the officials in the form of favorable personal loan

21

treatment and political contributions.  Id. at 113.

The government's indictment in Henry averred that, in rigging the bids, the officials defrauded the *other banks* of money and property, by denying them the opportunity to receive deposits of public funds.  Id.   In considering the sufficiency of the indictment, the Third Circuit held that competing banks' interest in a fair bidding opportunity did not constitute a property right cognizable under the federal fraud statutes.  Id. at 115.

In reaching its decision, the Third Circuit in Henry examined the Seventh Circuit's holding in United States v. Ashman, 979 F.2d 469 (7th Cir. 1992), which contained an analogous factual predicate.  Ashman involved soybean commodities brokers' schemes to defraud their customers by rigging orders with buyers of futures contracts.  Id. at 474-77.  The Third Circuit in Henry found support for its holding in the Seventh Circuit's determination that the defendant-brokers did not deprive other traders of a property interest by denying them opportunity to receive orders.  Henry, 29 F.3d at 116 (citing Ashman, 979 F.2d at 477-479).  The other traders in Ashman are analogous to the other banks in Henry, and both compare to the "other vendors" in the present case, none of whom were deprived of a property interest under the mail and wire fraud statutes.  Because these other banks, traders, and vendors have not been deprived of a property interest, they are not victims for the purposes of federal mail and wire fraud.  Therefore, the theory on which the government relies in using gain to KLH in support of its loss estimate is incorrect.

> b.     *Gain as an alternative measure of loss*

The government next argues that KLH was an unindicted co-conspirator in this case such that its gain can be used a surrogate measure of the Mint's actual loss in the event we find loss to

be indeterminable.  Although we do find that the Mint's actual loss can not been reasonably determined, and gain may therefore be a proper proxy for the loss amount, gain to KLH is not the appropriate measure.  Instead, the reasonably-determined gain to Walker of $6,113 provides the alternative measure of loss in this case.

While the actual or intended loss to the victim is the preferred measure of loss affecting the guidelines range, "the *defendant's* gain can appropriately be used as a measurement of loss." United States v. Yeaman, 194 F.3d 442, 456-457 (3d Cir. 1999)(emphasis added).  The government argues that, although KLH is not an actual defendant, we can find by a preponderance of the evidence that KLH was co-conspirator, and therefore its gain in the form of its profits can serve as an alternative to the Mint's loss.  However, we do not find by a preponderance of the evidence that KLH was a co-conspirator here.  At bottom, we cannot find that KLH committed the acts or possessed the mental state required to consider it a co-conspirator in this case.  In order to establish a conspiracy, the prosecution must prove (1) a shared "unity of purpose," (2) an intent to achieve a common goal, and (3) an agreement to work together toward the goal.  United States v. Wexler, 838 F.2d 88, 90–91 (3d Cir .1988).  The government, however, has not presented any evidence that allows us to determine that these elements are present here.  Therefore, the gain to KLH cannot function as an alternative to loss in this case.

Instead, we find that the gain to Walker in the supported amount of $6,113 in compensation, travel reimbursement, and gifts serves as the proper alternative to loss.[53]  In order to use the gain to Walker as a surrogate for loss, we must first conclude that there was *some*

---

[53]Gov't Sentencing Hr'g Ex. 210.

pecuniary loss to the Mint in this case.  See U.S.S.G § 2B1.1 cmt. n.3(C) ("The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined.")  The facts in this case show that Walker deprived the Mint of the opportunity to compete against other similarly-situated vendors by splitting requisitions, keeping them $1 below the $5,000 mandatory competition threshold, referring to a BPA he likely knew was false, approving a significant portion of requisitions himself, and concealing fact that he worked for KLH.  Walker admits that his conduct deprived the Mint of the ability to "adequately dole out [its] funds."[54]  In the absence of Walker's fraudulent conduct, it is highly likely that at least one of the orders he placed would have been subject to competitive bidding, and it is probable that KLH would have lost at least one of those bids.[55]  Clearly, but for the scheme, the Mint would have received more favorable terms through competing suppliers on at least one occasion.  We find by a preponderance of the evidence, therefore, that the Mint suffered pecuniary loss in this case.  However, for the reasons discussed above, actual loss to the Mint cannot been estimated through any reasonably reliable means.  Accordingly, gain to the defendant, Walker, shall provide the alternative measure.  The government provided evidence of gain to Walker between $6,000 and $7,000 over the life of the fraud, with documentation to support $6,113.  We find this figure to represent his gain, and a logically related surrogate measure of actual loss to the Mint in this case.

---

[54]Change of Plea Hr'g at 86 (Feb. 24. 2011).

[55]The Seventh Circuit in Ashman, as discussed above, found that the defendant-brokers defrauded their customers, whose money and orders they had control over, by depriving them of the opportunity to receive bids on their orders, and thus obtain more favorable terms in the market.  Ashman, 979 F.2d at 478.

At the hearing on this issue, the government argued that Walker's salary should also be considered as part of his gain.  When asked for the authority for this proposition, counsel for the government could not identify any Court of Appeals cases, but stated "I can cite Judge Diamond in an opinion United States v. Jason Lee Edwards from -- I can't tell you the docket number off the top of my head, but I can tell you we've used that, Your Honor."[56]  A review of the docket for the case the government references,  United States v. Hellmann, et al., No. 08-cr-480-PD (E.D. Pa. filed Aug. 14, 2008), reveals that, as part of a plea agreement, defendant Christina Hellmann agreed to pay restitution of $12,830.55—an amount which her co-defendant, Jason Lee Edwards, earned in salary while he aided Hellmann in defrauding Edwards' employer of its intellectual property.  (Id. at Plea Agreement, Doc. No. 61.)  While we located the docket entry reflecting this plea agreement, the docket reflects that Judge Diamond has not, in fact, issued an opinion on the issue.  Instead, it appears that the government's position is supported only by a defendant's affirmative agreement to use her co-defendant's salary as a restitution.  We find this to fall at the low end of the spectrum of persuasive authority.

 Despite the loose manner in which the government raises this issue, we consider the government's argument, and find it meritless.  Third Circuit precedent provides that a court may look to a defendant's gain as an alternative measure where there is a "logical relationship between the victim's loss and the defendant's gain so that the latter can reasonably serve as a surrogate for the former."   Yeaman, 194 F.3d at 456 -457 (internal citation and quotation marks omitted).  We fail to see the logical relationship between Walker's pre-determined place on the government pay scale and the amount of money he caused the Mint to lose by way of overcharge

---

[56]Doc. No. 96, Sentencing Hr'g Tr.  279:6-9 (May 25, 2011).

or competitive deprivation.  In its indictment, response to Walker's motion to dismiss the

indictment, sentencing memorandum, and at the sentencing hearing, the government rested its

entire fraud theory on the idea that the Mint paid more to KLH than it would have had Walker

ordered supplies through the "proper channels."[57]   The government's loss estimate of

$497,772.22 is born out of this theory— this is the amount the government alleges the Mint paid

to KLH over that which it would have paid through GSA.  Walker's salary from the Mint in no

way logically reflects this loss, and is completely inconsistent with the theory of fraud under

which he was prosecuted.

     B.     Sophisticated Means

The government argues that a 2-level enhancement for "use of sophisticated means"

under Section 2B1.1(b)(9)(C) should apply in this case; the Probation Department determined it

should not.  We also find there should be no enhancement for use of sophisticated means.

The Guidelines define "sophisticated means" as

> especially complex or especially intricate offense conduct pertaining to the execution or
> concealment of an offense.  For example, in a telemarketing scheme, locating the main
> office of the scheme in one jurisdiction but locating soliciting operations in another
> jurisdiction ordinarily indicates sophisticated means.  Conduct such as hiding assets or
> transactions, or both, through the use of fictitious entities, corporate shells, or offshore
> financial accounts also ordinarily indicates sophisticated means.

U.S.S.G. § 2B1.1 cmt. n.8(B).  The government cites the Seventh and Eighth Circuit's

statements that the sophisticated means enhancement is implicated "when the offense conduct

shows a greater level of planning or concealment than a typical fraud of its kind,"  United States

v. Knox, 624 F.3d 865, 871 (7th Cir. 2010)(internal citation and quotation marks omitted), and

_____

    [57]Doc. No. 95, Sentencing Hr'g Tr.  176:8 (May 24, 2011).

when "the offense conduct, viewed as a whole, was notably more intricate than that of the garden variety offense," <u>Unites States v. Jenkins</u>, 578 F.3d 745, 751 (8th Cir. 2009).  Under these definitions, and the Guidelines' examples, Walker's scheme was not sophisticated—it was not notably more intricate than the typical or garden variety.  Indeed, we find this case to constitute a rather straightforward and witless instance of procurement fraud.  Accordingly, no enhancement under Section 2B1.1(b)(9)(C) applies.

        C.        Abuse of a Position of Trust

The Probation Department applied a 2-level enhancement for abuse of a position of public or private trust under Section 3B1.3.  Walker objects.  We find that the adjustment properly applies.

The application notes to Section 3B1.3 define a position of public or private trust as

a position . . .  characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference).  Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature.  For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult).  This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination.  This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

U.S.S.G. § 3B1.3 cmt. n.1.

In applying this Sentencing Guideline, the Third Circuit has employed a two-step analysis, which considers: (1) whether the defendant occupied a position of public or private trust; and (2) whether the defendant abused this position of trust in a way that significantly

facilitated the crime.  United States v. Hart,  273 F.3d 363, 375 (3d Cir. 2001).  Regarding the

first step of the inquiry, the Third Circuit has stated:

> Determining what constitutes a position of trust for the purposes of § 3B1.3 is not
> a simple task . . . .  The Commentary to § 3B1.3 indicates that the Sentencing
> Commission . . . did not intend for the term "position of trust" to be interpreted
> too narrowly, as the Commentary does not limit the phrase's application only to
> formal fiduciary or employment relationships.  See U.S.S.G. § 3B1.3, comment
> (n.1) (Nov.1997).  However, a court should hesitate before defining the concept
> too broadly, as "there is a component of misplaced trust inherent in the concept of
> fraud."  United States v. Garrison, 133 F.3d 831, 838 (11th Cir. 1998) (quoting
> United States v. Mullens, 65 F.3d 1560, 1567 (11th Cir. 1995) (internal quotation
> marks omitted)); see also United States v. Trammell, 133 F.3d 1343, 1355 (10th
> Cir. 1998) ("The [§ 3B1.3] guideline enhancement requires more than a mere
> showing that the victim had confidence in defendant.") (citing United States v.
> Brunson, 54 F.3d 673, 678 (10th Cir. 1995)); United States v. Koehn, 74 F.3d
> 199, 201 (10th Cir. 1996) ("In every successful fraud the defendant will have
> created confidence and trust in the victim, but the sentencing enhancement is not
> intended to apply in every case of fraud.").

United States v. Iannone, 184 F.3d 214, 222 (3d Cir. 1999).

Recognizing that the determination as to whether a defendant holds a position of trust

under the Guidelines is "not a simple task," the Third Circuit established a three-factor test in

United States v. Pardo, 25 F.3d 1187 (3d Cir. 1994), which guides the district court's decision.

Under this test, the district court must consider: "(1) whether the position allows the defendant to

commit a difficult-to-detect wrong; (2) the degree of authority which the position vests in

defendant vis-a-vis the object of the wrongful act; and (3) whether there has been reliance on the

integrity of the person occupying the position."  Id. at 1192.  The Court noted that these factors

should be considered in light of the guiding rationale of the section: "to punish 'insiders' who

abuse their positions rather than those who take advantage of an available opportunity."  Id.

We find that, given the definition and examples provided by the Guidelines, and the

Third Circuit's test as articulated in Pardo, Walker held a position of trust such that the

enhancement applies.  Under the Guidelines' statement, Walker's position in the Mint's supply department was characterized by significant professional discretion.   Although Walker had a degree of discretion under both the requisition and credit card processes,  Walker had more freedom to order as he wished under the latter method.   There, Walker was bound only by general statements in the 2002 and 2004 Purchasing Card Guidelines that the Mint had "preferred vendors" in place for certain goods such as office and IT supplies.   Nothing suggests that these vendors were anything other than simply suggested—clearly, they were not mandatory.  By the 2005 iteration of the Purchasing Card Handbook, the language regarding "preferred vendors" was deleted.  In its place, the 2005 Handbook contained a statement that "the Mint encourages the use of small, minority, and women-owned businesses . . . ."  This statement vests even more professional discretion in the purchasing card user.  It seems that the only limitations on Walker's credit card use came through monetary ceilings—$5,000 per purchase and $32,000 per month.  Walker was able to stay beneath these limits, and at the same time order $438,671.71 from a company in which he had an unlawful personal and financial interest.

The three-factor Pardo analysis supports our Guidelines-based application.  Under the first factor, Walker's position allowed him to commit a difficult-to-detect wrong.  Again, especially with regard to the credit card purchases, Walker did not receive much in the way of instruction, supervision, or monitoring.  Although it was Mint policy to reconcile Walker's credit card purchases at the end of the month, without the knowledge that Walker was receiving gifts and compensation from KLH on the side, it would have been difficult for anyone at the Mint to discover that these purchases were improper.  Second, as we discussed under the Guidelines

definition above, Walker had a significant amount of authority to purchase as he wished.  While

the Mint nudged credit card uses toward preferred vendors at one time, and toward small

business, minority, and women vendors at another, Walker had essentially unlimited authority

below a certain monetary threshold vis-a-vis the object of his wrongful act, i.e., ordering from

KLH.  Finally, the evidence is clear that there was reliance on Walker's integrity in entrusting

him with his position.  The Procurement Guidelines state:

> Integrity.  The acquisition team shall be held to Department standards of conduct
> in performing their duties and shall conduct themselves so as to avoid even the
> appearance of any impropriety.  An essential consideration in every aspect of the
> acquisition process must be maintaining the public trust.  Members of the
> acquisition team shall not take part in any action that may result in or create the
> appearance of a loss of complete independence or impartiality or adversely affect
> the public's confidence in the integrity of the Mint.[58]

Accordingly, this, and each of the three factors set out in Pardo, weighs in favor of Walker's

position at the Mint being one of trust as implicated by the Guidelines.

Having found that Walker's position was one of trust, we can easily determine that

Walker abused that position in a way that significantly facilitated his crime.  Hart, 273 F.3d at

375.  Walker took advantage of the professional discretion he was afforded by the Mint and

caused it to order hundreds of thousands of dollars in goods from one company, while he

received more than $6,000 in compensation and gifts from that company.  Thus, we find the

Probation Department properly included a 2-level enhancement for abuse of position of trust

under Section 3B1.3 of the Guidelines.

> D.      Obstruction of Justice and Acceptance of Responsibility

The courts and the Guidelines recognize that the 2-level enhancement for obstruction of

---

[58]Procurement Guidelines, Def's Sentencing Hr'g  Ex. 12 at 4(C)(Nov. 2003).

justice and the 2-level reduction for acceptance of responsibility are ordinarily mutually

exclusive.  However, there may be "extraordinary cases" in which both adjustments apply.  We

find that Walker presents such an extraordinary case.

Section 3C1.1 of the Guidelines, entitled "Obstructing or Impeding the Administration of

Justice," provides for a two-level enhancement if "(A) the defendant willfully obstructed or

impeded, or attempted to obstruct or impede, the administration of justice with respect to the

investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the

obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct;

or (ii) a closely related offense."  On the other hand, Section 3E1.1, "Acceptance of

Responsibility,"  provides for a two-level decrease in offense level "if the defendant clearly

demonstrates acceptance of responsibility."  The Guidelines note that, "[c]onduct resulting in an

enhancement under § 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily

indicates that the defendant has not accepted responsibility for his criminal conduct.  There may,

however, be extraordinary cases in which adjustments under both §§ 3C1.1 and 3E1.1 may

apply."  U.S.S.G § 3E1.1 cmt. n.4.  Whether a defendant presents one of the "extraordinary

cases" warranting adjustment under both Sections 3E1.1 and 3C1.1 "requires consideration of

the totality of the circumstances, including the nature of the defendant's obstructive conduct and

the degree of the defendant's acceptance of responsibility."  United States v. Brown,  80 Fed.

App'x 794, 795 (3d Cir. 2003) (citing United States v. Honken, 184 F.3d 961, 968 (8th Cir.

1999)).  Upon consideration of the totality of the circumstances, we find that a number of factors

convolve to diminish the tension between Sections 3C1.1 and 3E1.1, such that both properly

apply.

1.  Obstruction Enhancement

Unquestionably, the obstruction of justice enhancement applies.  Application Note 4 to the provision indicates that the § 3C1.1 enhancement is to apply "to any other obstructive conduct in respect to the official investigation, prosecution, or sentencing of the instant offense *where there is a separate count of conviction for such conduct*." (Emphasis added).   Walker admitted to lying to a federal agent regarding the money he received from KLH, and pled guilty to the count of the indictment reflecting this conduct.  Accordingly, the enhancement applies.

Walker argues that it would be "excessive and harsh" to include an enhancement for Obstruction of Justice when that conduct has been separately charged.[59]   The federal courts of appeal are in agreement, however, that where a defendant is convicted of a separate count for obstructive conduct, the two-point enhancement under § 3C1.1 applies.  United States v. Davist, 481 F.3d 425, 427 (6th Cir. 2007) (collecting cases).  Furthermore, the Guidelines make very clear that,

> [i]f the defendant is convicted both of and obstruction offense . . . and an underlying offense . . . , the count for the obstruction offense will be grouped with the count for the underlying offense . . . .   The offense level for that group of closely related counts will be the offense level for the underlying offense increased by the 2-level adjustment specified by this section, or the offense level for the obstruction offense, whichever is greater.

U.S.S.G. § 3C1.1 cmt. n.8.  Accordingly, the underlying conduct, in this case mail and wire fraud, and the obstructive conduct, in this case Walker's false statements made to a government agent investigating his fraud, are properly grouped together.  Under the Guidelines directive in Comment 8 to Section 3C1.1, however, we must compare the offense level for the underlying conduct, plus the enhancement, with the offense level for the obstructive conduct to determine

---

[59]Doc. No. 88,  Def.'s Sentencing Mem.,at 16-17.

which is greater.  Appendix A to the Guidelines instructs that the Chapter Two Guideline

provision applicable to the statutory offense of conviction for 18 U.S.C. §1001 in this case is

Section 2B1.1.  That provision, in turn, provides a base offense level of six.  U.S.S.G.

§2B1.1(a)(2).  Even if the other adjustments were relevant or appropriately applied to the

obstructive conduct considered alone, the offense level for the obstructive conduct would be less

than the offense level for the underlying fraud with the obstruction enhancement, which is 13,[60]

before any adjustment for acceptance of responsibility.  Therefore, the 2-level enhancement

properly applies.

### 2. Acceptance of Responsibility

We find that, although the 2-level enhancement for obstruction of justice applies to

Walker, the 2-level reduction for acceptance of responsibility also applies.  The first

consideration listed in Application Note 1 to Section 3E1.1 of the Guidelines provides that, in

determining whether a defendant has accepted responsibility under the Guidelines, the district

court should consider whether the defendant:

> truthfully admitt[ed] the conduct comprising the offense(s) of conviction, and
> truthfully admitt[ed] or [did] not falsely deny[] any additional relevant conduct
> for which the defendant is accountable under §1B1.3 (Relevant Conduct).  Note
> that a defendant is not required to volunteer, or affirmatively admit, relevant
> conduct beyond the offense of conviction in order to obtain a reduction under
> subsection (a).  A defendant may remain silent in respect to relevant conduct
> beyond the offense of conviction without affecting his ability to obtain a
> reduction under this subsection.  However, a defendant who falsely denies, or
> frivolously contests, relevant conduct that the court determines to be true has

---

[60]The base level offense for the underlying fraud under Section 2B1.1(a) is 7.  We have
already determined that separate 2-level enhancements apply for the $6,113 loss amount under
Section 2B1.1(b)(1) and for abuse of a position of trust under Section 3B1.3.  Adding-in the
2-level enhancement for the obstructive conduct amounts to an adjusted offense level for the
underlying fraud conduct of 13.

acted in a manner inconsistent with acceptance of responsibility . . . .

U.S.S.G. § 3E1.1 App. n.1.

The Third Circuit instructs that "[t]he defendant bears the burden of establishing by a preponderance of the evidence that he is entitled to the sentence reduction." United States v. Muhammad, 146 F.3d 161, 167 (3d Cir. 1998). That a defendant pleads guilty does not automatically mean that defendant merits a reduction in offense level under the Guidelines; rather, it is the sentencing court's "obligation to assess the totality of the situation in determining whether the defendant accepted responsibility." United States v. McDowell, 888 F.2d 285, 293 n.2 (3d Cir. 1989). The Guidelines provide that "a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction . . . will constitute significant evidence of acceptance of responsibility . . . . However, this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility." U.S.S.G. § 3E1.1 cmt. n.3.

Upon consideration of the totality of the circumstances, we find that (1) Walker accepted responsibility such that the enhancement applies, and (2) a number of factors diminish the theoretical tension between our findings as to his acceptance of responsibility and his obstructive conduct, making Walker's case an "extraordinary" one where both adjustments apply.

The record is clear that Walker pled guilty prior to the commencement of trial and admitted the conduct comprising the offense of his conviction. Walker's only substantive denials at his plea hearing were that: (1) he did not work for KLH prior to 2005[61]; (2) he did not

---

[61]Change of Plea Hr'g at 61.

34

create the false BPA number for KLH [62]; (3) approving requisitions was not outside the scope of

his job responsibilities[63]; and (4) he was not the only one who referenced the false BPA number

for KLH.[64]   The government offered no reliable proof regarding any of these areas, and,

therefore, we do not find that Walker was being untruthful in any of these denials.  Accordingly,

we find that Walker has truthfully admitted the conduct comprising the offenses of his

conviction, and he has not falsely denied any additional relevant conduct.

The totality of the circumstances demonstrates that Walker's case is an extraordinary one

where the acceptance of responsibility adjustment properly applies despite the fact that the

obstruction of justice enhancement also applies.  The obstructive conduct that formed the basis

of our enhancement was that which was charged in Count 18 of the indictment.  The indictment,

filed on July 16, 2009, charged Walker under 18 U.S.C § 1001 with making false statements on

March 21, 2006  to an investigator with the Department of Treasury Office of Inspector General

when Walker stated that he had never worked for KLH or its president.  In fact, KLH tax

documents showed that Walker had indeed worked for KLH.  Although this clearly constitutes

obstruction warranting an enhancement under the guidelines, the nature of this conduct and the

degree of Walker's a acceptance of responsibility are such that Walker may also benefit from the

two-level adjustment for accepting responsibility.

First, Walker's obstructive conduct was not inconsistent with his acceptance of

responsibility.  United States v. Hopper,  27 F.3d 378, 383 (9th Cir. 1994).  Walker's obstructive

---

[62]Change of Plea Hr'g at 63.

[63]Change of Plea Hr'g at 67.

[64]Change of Plea Hr'g at 69.

conduct occurred long before the indictment was filed in this case.  Although he initially attempted to conceal the crime, he eventually accepted responsibility for the underlying crime and the obstructive conduct, and he abandoned his attempts to obstruct justice.  Id.

Second, the nature of Walker's obstructive conduct was not such that it significantly derailed or burdened the government's investigation.  Though Walker did initially deny that he had worked for KLH, it was certainly no Sherlockian leap or sisyphean burden to obtain and review KLH's employee records for Walker.  Those records clearly demonstrate that Walker worked for KLH.

Finally, the degree and nature of Walker's acceptance of responsibility weigh in favor of deeming this an extraordinary case in which the 2-level reduction properly applies.  Although there was a delay or more than a year and a half between the filing of the indictment on July 16, 2009 and Walker's guilty plea on February 24, 2011, once Walker admitted to his conduct, he did so completely.   Furthermore, the delay between the indictment and Walker's ultimate concession was not unwarranted.  This conclusion is supported by two factors: (1) the uncertain nature of the law on one of the key statutory violations charged; and (2) the nature of the government's theory of loss under which it was proceeding.

The filing of the fraud charges in this case coincided with a period of legal disquiet as to the status of honest services fraud under 18 U.S.C. § 1346—a statutory provision listed in each of the government's ten fraud charges against Walker.  On October 13, 2009, less than three months after the government filed its indictment against Walker, the Supreme Court granted certiorari in the case of United States v. Skilling. 554 F.3d 529 (5th Cir. 2009), cert. granted, —— U.S. ——, 130 S.Ct. 393 (2009).  That case was to squarely address the law of honest services

fraud.  As a result of the Supreme Court's June 24, 2010 holding that honest services fraud

implicated only bribery and kickback schemes,  Skilling v. United States., —— U.S. ——, 130

S.Ct. 2896, 2931 (2010), we directed the parties in this case to brief us as to "[w]hether Counts

One through Ten of the Indictment (Doc. No. 1) sufficiently aver honest services fraud under 18

U.S.C. § 1346 in light of the Supreme Court's June 24, 2010 decision in Skilling."  (Doc. No. 42,

Sept. 15, 2010.)  On November 12, 2010, the government filed notice stating that, "[a]t the trial

of this case, the government will not pursue the "honest services" fraud component (18 U.S.C. §

1346) of the mail fraud and wire fraud charges in Counts 1 through 10 of the indictment.

Instead, the Government will present evidence and seek a conviction based upon traditional

violations of mail fraud and wire fraud." (Doc. No. 46.)  Unquestionably, the government's

pursuit and abandonment of this theory of fraud gave Walker legitimate pause.

     The government's improper loss theory gave Walker further reason to hesitate before

entering any plea or offering any admissions.  The government in this case sought a sentence of

72 months based on its theory that Walker caused the mint to lose almost $500,000.  The

government's loss calculation single-handedly extended the Guidelines level from 13, with a

recommended imprisonment term of 12-18 months, to 27, with a recommended imprisonment

term of 70-87 months.  We have already seen that the government's theory and calculation of

loss were flawed.  As we have explained, Walker's correct Guidelines level on the Group One

Counts is 13, prior to a reduction for acceptance of responsibility, which undoubtedly applies.

     E.    Offense Level Computation

     Under Section 2B1.1(a)(1) of the Guidelines, the base offense level for the Group One

Counts—mail fraud, wire fraud, and making false statements—is 7.  Factoring in the 2-level

enhancements for loss under Section 2B1.1(b)(1)(B), abuse of position of trust under Section 3B1.3, and obstruction of justice under Section 3C1.1,[65] Walker's Adjusted Offense Level for the Group One Counts is 13.

The Group Two Counts, consisting of five conflict of interest charges, carry a base offense level of 6 under Section 2C1.3(a).  A 4-level enhancement applies for actual harm to the victim under Section 2C1.3(b)(1) and a 2-level enhancement for obstruction of justice applies under Section 3C1.1.[66]  The Adjusted Offense Level for the Group Two Counts is 12.

Taking into account a 2-level enhancement under Section 3D1.4 for the Group Two Counts being 1 to 4 levels less serious than the Group One Counts, the Combined Offense Level is 15.  Applying the 2-level reduction as appropriate under Section 3E1.1 for Walker's acceptance of responsibility leads to a Total Offense Level of 13.

III.    CONCLUSION

For the foregoing reasons, the United States Government's objections to the Probation Department's Presentence Report are overruled, and Defendant Michael Walker's objections are overruled in part and sustained in part.  Under the United States Sentencing Commission

---

[65]As we discuss in Section II.D.1 above, Comment 8 to U.S.S.G § 3C1.1, requires that we compare the offense level for the underlying conduct plus the enhancement with the offense level for the obstructive conduct to determine which is greater.  Section 2B1.1(a)(2)  provides a base offense level of 6 for the obstructive conduct charged under 18 U.S.C. § 1001.  Even if the other adjustments were relevant or appropriately applied to the obstructive conduct considered alone, the offense level here would be less than the offense level for the underlying fraud plus the obstruction enhancement.

[66]As was the case with the Group One Counts, under comment 8 to U.S.S.G § 3C1.1, the underlying conduct plus the two level enhancement carries a greater offense level than the obstructive conduct alone, accordingly the 2-level enhancement is applied.

Guidelines Manual, the Total Offense Level for Walker's offenses is 13.  An appropriate Order follows.